IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| VIRGINIJUS STUNZENAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:21CV430 |
| | ) | |
| LINCOLN NATIONAL | ) | |
| CORPORATION, THE LINCOLN | ) | |
| NATIONAL LIFE INSURANCE | ) | |
| COMPANY, and DERREL FEREBEE, | ) | |
| individually, | ) | |
| | | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Before the Court is a Motion for Summary Judgment, (ECF No. 24), filed by Defendants Lincoln National Corporation, The Lincoln National Life Insurance Company, and Derrel Ferebee ("Defendants"). Plaintiff Virginijus Stunzenas initiated this action against Defendants for alleged violations of the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*; and North Carolina public policy as outlined in the North Carolina Equal Employment Practices Act, ("NCEEPA"), N.C. Gen. Stat. § 143-422.2(a). (ECF No. 5.) Defendants now move for summary judgment on all claims. For the reasons stated herein, Defendants' motion will be granted on all claims.

## I.     BACKGROUND

Plaintiff Virginijus Stunzenas ("Stunzenas") was born in 1964 and is of Lithuanian descent.  (ECF No. 25-45 at 8:24–9:2 ("Stunzenas dep.").)  In 2003, Stunzenas began work at Lincoln National Life Insurance Company in Greensboro, North Carolina.  (ECF Nos. 25-2 at 4; 30-2 at 4.)  He held the position of New Business Associate ("NBA") from 2008 to 2014, then later transitioned to a position as a Quality Assurance Support Associate ("Auditor") from 2015 until his termination in 2019.  (ECF Nos. 25-2 at 2–4; 30-2 at 2–4.)  The role of an NBA includes processing new life insurance applications and entering them into Lincoln's system.  (ECF No. 25-39 at 21:23–22:4 ("Ferebee dep.").)  The role of Auditor includes auditing those applications to ensure compliance with Lincoln's policies and procedures. (Stunzenas dep. at 36:9–37:8, 38:12-18; Ferebee dep. at 80:11-22.)

Defendant Derrel Ferebee was Stunzenas' supervisor beginning in October 2018. (Ferebee dep. at 29:10-12, 49:22–50:1.)  Both Ferebee and Stunzenas worked in the Underwriting and New Business Department.  (Ferebee dep. at 41:15-19.)

In January 2019, after the birth of his twin daughters, Stunzenas took three weeks of paid parental leave pursuant to Lincoln's Parental Leave Policy.  (Stunzenas dep. at 62:12–63:6; 63:20–64:8; Ferebee dep. at 206:14-20.)

In February 2019, Stunzenas made a request for paid time off ("PTO") for the period of September 16, 2019, through October 4, 2019, to spend time with his children.  (Stunzenas dep. at 68:1–69:5; ECF No. 25-6 at 3.)  This request was discussed between Stunzenas and Ferebee in either February or March 2019.  (Stunzenas dep. at 69:21–70:11; Ferebee dep. at 18:4-19.)  Stunzenas' department typically required PTO requests to be made closer in time to

the requested days off due to considerations about "business need." (Ferebee dep. at 8:18-25, 11:13-22.)

Sometime later in February 2019, Ferebee informed Stunzenas that he could not yet approve Stunzenas' PTO request because it exceeded two weeks and was too far in advance of the requested dates. (Ferebee dep. at 17:18–18:19, 203:6-19; Stunzenas dep. at 71:6-11.) In response, Stunzenas suggested to Ferebee that he could instead request FMLA leave; however, Stunzenas did not make any such request at that time. (Stunzenas dep. at 71:12-21, 73:2-9, 95:5-14.) Ferebee delayed responding to Stunzenas' PTO request until business needs could be determined. (Ferebee dep. at 18:6-19; Stunzenas dep. at 70:7-20.)

The year of 2019 was considered busy for Lincoln. Ferebee's and Stunzenas' department experienced an increase in the number of life insurance policy applications to be audited. (Stunzenas dep. at 84:2-7; Ferebee dep. at 8:6-9.) Lincoln management authorized auditors to work overtime to manage this "increased 'audit inventory.'" (Ferebee dep. at 249:1–250:16.) Stunzenas received approval from Ferebee to work additional overtime so that he could help clear their team's audit inboxes. (Stunzenas dep. at 121:19–124:1.)

Beginning in June 2019, Stunzenas reported working several hours of overtime. (ECF Nos. 25-25 at 2; 25-26 at 2–7.) Stunzenas reported 57 hours of overtime in June alone. (ECF No. 25-22 at 2.) Soon after, in July, Ferebee's supervisor raised concerns about the large amount of overtime that Stunzenas was reporting. (ECF No. 25-23 at 2.) This prompted Ferebee to review Stunzenas' performance statistics via the Verint software for the days which he claimed overtime. (Ferebee dep. at 219:9–220:1, 241:20–242:21.)

Verint is a productivity-monitoring software that was installed on Lincoln employees' workstations in early March 2019. (Ferebee dep. at 219:17-22; ECF No. 25-11 at 2.) It tracks

users' interactions with their keyboard and mouse and records time as "idle" after one minute of no interaction or as "inactive" after fifteen minutes or more. (Ferebee dep. at 244:1-11.) Additionally, Verint produces productivity metrics by measuring the number of audits completed and time worked against an average time. (Ferebee dep. at 96:15-23.) Stunzenas was informed in February 2019 at a company meeting that his activity would be tracked via Verint. (Stunzenas dep. at 135:21–138:8.)

Ferebee initially saved Stunzenas' Verint data to his computer around August 13, 2019. (Ferebee dep. at 273:6-16, 273:21–274:12, 276:1-17.) Ferebee reviewed this data sometime before August 26, 2019. (*Id.* at 284:16-24.) According to the Verint data, Stunzenas registered several hours of inactivity or idleness on the days in which he logged overtime hours:

- On June 22, 2019, Stunzenas reported 7 hours of overtime, while Verint registered his idle/inactive time at 4.3 hours;

- On June 29, 2019, Stunzenas reported 5 hours of overtime, while Verint registered his idle/inactive time at 5.3 hours;

- On June 30, 2019, Stunzenas reported 8.5 hours of overtime, while Verint registered his idle/inactive time at 3.4 hours;

- On July 1, 2019, Stunzenas reported 5.5 hours of overtime, while Verint registered his idle/inactive time at 5.4 hours;

- On August 12, 2019, Stunzenas reported 3 hours of overtime, while Verint registered his idle/inactive time at 4.6 hours;

- On August 13, 2019, Stunzenas reported 3.5 hours of overtime, while Verint registered his idle/inactive time at 4.95 hours.

(ECF No. 25-26 at 2–7.)

In terms of the individual "productivity scores" assigned to each auditor in Ferebee's and Stunzenas' department, Stunzenas' score of 89.01% was commensurate or higher than his peers. (Ferebee dep. at 222:14–223:5.) At the time, Lincoln did not have any productivity standard or minimum productivity score requirement. (*Id.*)

4

Ferebee and his human resources business partner, Robyn Konnick, discussed these findings in a meeting around August 26, 2019, and they determined that Stunzenas had misrepresented his overtime worked. (Ferebee dep. at 232:2-4; ECF No. 25-42 at 9:3-11, 19:16-25, 31:7-11 ("Konnick dep.").) These findings were also brought to various vice presidents, who agreed with the determination that Stunzenas misrepresented his overtime and supported moving forward with his termination. (Ferebee dep. at 240:13-241:1; ECF No. 25-43 at 14:8-22, 21:8-10, 22:18–23:8, 38:17–39:11 ("Morrison dep.").) The ultimate decision to terminate Stunzenas was communicated via email from Ferebee to Konnick on August 30, 2019. (ECF No. 25-29 at 2.)

Meanwhile, the week of August 12, 2019, Stunzenas requested FMLA leave for the period of September 16 to October 4 (the same period he initially requested PTO for in February which was not yet approved). (Stunzenas dep. at 73:23–74:5, 87:13-22.) His FMLA request was approved on August 16, 2019. (ECF No. 25-30 at 2.)

Before Stunzenas could take his FMLA leave, on September 5, 2019, Lincoln terminated Stunzenas' employment for the alleged misrepresentations of his overtime work. (ECF Nos. 30-2 at 2; 25-35 at 2.) Misrepresentation of time worked was grounds for immediate termination under Lincoln's "Cause for Immediate Termination" policy. (Ferebee dep. at 241:11-19; ECF No. 25-28 at 2.)

During the meeting where Stunzenas was terminated, Ferebee followed a "Termination Talking Points" memorandum. (ECF No. 25-35 at 2.) That memorandum includes information about Stunzenas' overall productivity threshold, then breaks down the metrics on Stunzenas' overtime hours reported alongside inactive/idle time. (*Id.*) It further notes an example of how "the amount of work processed does not support the additional overtime

5

hours worked," showing how in April 2019, Stunzenas processed 410 audits with 0 hours of overtime and 6 hours of PTO, while in June 2019, he processed 518 audits with 57 hours of overtime and no PTO. (*Id.*) The final paragraph of the memorandum reads as follows: "Deliberately tracking overtime hours not worked is unacceptable, in direct conflict with Lincoln's Code of Conduct and demonstrates a lack of integrity. Your actions, as outlined above demonstrates falsification of records and is grounds for immediate termination. Your last day as an employee of Lincoln Financial Group is today." (*Id.*)

Stunzenas initially brought this action on April 28, 2021, in North Carolina state court, raising six claims: (1) retaliation in violation of FMLA; (2) interference in violation of FMLA; (3) wrongful discharge because of race and national origin in violation of NCEEPA; (4) wrongful discharge because of age in violation of NCEEPA; (5) discrimination and wrongful termination because of race and national origin in violation of Title VII; and (6) age discrimination in violation of the ADEA. (ECF No. 1-1.) On May 28, 2021, Defendants gave notice of removal to this Court. (ECF No. 1.)

Defendants filed the instant summary judgment motion on May 20, 2022, and request that this Court grant judgment in their favor on all of Plaintiff's claims. (ECF No. 24.) Defendants maintain that all of Stunzenas' claims "fail because the undisputed material facts show Stunzenas was terminated for a legitimate, non-discriminatory and non-retaliatory reason and treated the same as others who engaged in the same behavior," as well as that Stunzenas "cannot show Lincoln's reason for termination was a pretext for discrimination or retaliation." (ECF No. 25 at 2.) Defendants also contend that "the undisputed material facts show there is no evidence to support individual liability against Ferebee or Stunzenas' claims of FMLA interference." (*Id.*)

6

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).  "[I]n deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs*, 780 F.3d at 568).  A court "cannot weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 569, and thus must "usually" adopt "the [nonmovant's] version of the facts," even if it seems unlikely that the moving party would prevail at trial, *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).  Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record" or "showing that the materials

7

cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 324.

## III.    DISCUSSION

### A.    FMLA Retaliation

The FMLA protects employees "from discrimination or retaliation for exercising their substantive rights under the FMLA." *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294 (4th Cir. 2009) (quoting *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 546 (4th Cir. 2006)). To establish sufficient circumstantial evidence of retaliation for exercising FMLA rights, a plaintiff must show (1) "that he engaged in protected activity," (2) "that the employer took adverse action against him," and (3) "that the adverse action was causally connected to plaintiff's protected activity." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016) (quoting *Yashenko*, 446 F.3d at 551). If a plaintiff establishes a prima facie case, the employer may offer a non-retaliatory reason for the adverse action, and then the plaintiff "bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation." *Yashenko*, 446 F.3d at 551 (4th Cir. 2006) (quoting *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001)).

Defendants concede the first two elements of FMLA retaliation and maintain that Stunzenas cannot show the third element—that is, a causal connection between Stunzenas' August 2019 request for FMLA and Lincoln's subsequent termination of his employment on September 5, 2019. (ECF No. 25 at 25.) Specifically, Defendants maintain that "[t]he undisputed facts show that Morrison and Ferebee started an inquiry into Stunzenas' reported overtime in July 2019 and that Ferebee was reviewing Stunzenas' Verint activity data before he learned of Stunzenas' FMLA request on August 16, 2019. Thus, Lincoln had set in motion

8

the investigation into Stunzenas' misrepresenting time worked, which led to his termination, well before Stunzenas requested FMLA." (*Id.*)

Stunzenas, on the other hand, argues that he can satisfy the causal connection element of his retaliation claim by virtue of the temporal proximity between his termination date and the approval of his FMLA request. (ECF No. 28 at 19–20.) Stunzenas argues that he "was terminated on September 5, 2019, a mere twenty-two days after being approved and just eleven days prior to the start of his FMLA Leave," and that such a "short timeframe between protected activity and adverse employment action certainly establishe[s] the third element of temporal proximity." (*Id.* at 21.)

While the Court agrees that a close temporal proximity between Stunzenas' FMLA leave request and ultimate termination may be sufficient to make a prima facie case of retaliation, such temporal proximity "far from conclusively establishes the requisite causal connection." *Yashenko*, 446 F.3d at 551 (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)).

If a plaintiff establishes a prima facie case of FMLA retaliation, then under the *McDonnell Douglas* framework the burden shifts to the defendant to articulate a non-discriminatory reason for an adverse action. *Id.* at 550–51. If the defendant articulates such a reason, the burden shifts back to the plaintiff who then "bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation." *Id.* at 551 (quoting *Nichols*, 251 F.3d at 502); *see also Fry v. Rand Constr. Corp.*, 964 F.3d 239, 246 (4th Cir. 2020) ("A plaintiff relying on the *McDonnell Douglas* framework must 'put on sufficient evidence to allow a jury to find both retaliatory animus and pretext' to avoid judgment as a matter of law in an FMLA case." (quoting *Dotson*, 558 F.3d at 296)).

Here, Defendants have articulated a non-discriminatory reason for Stunzenas' termination—that is, "Lincoln terminated Stunzenas under its Cause for Immediate Termination policy for misrepresenting time because Stunzenas was found to have been 'idle' and 'inactive' and thus not working while claiming to be working substantial amounts of overtime." (ECF No. 25 at 26.) Thus, the onus shifts back to Stunzenas to prove by a preponderance of the evidence that this stated reason for his termination was pretext and that the true reason was discriminatory.

Stunzenas first maintains that "Ferebee and Lincoln have offered different explanations at different times for why Stunzenas was terminated" which "is probative of pretext." (ECF No. 28 at 22.) Specifically, Stunzenas cites discussions concerning his productivity as in conflict with concerns about the discrepancies in his overtime hours logged. (*Id.*) It is clear from the evidence presented that while Lincoln certainly expressed concern over Stunzenas' productivity initially, that the ultimate reason for his termination was the concern over his overtime misrepresentations. (ECF No. 25-35 at 2.) Ferebee's talking points demonstrate this: "Deliberately tracking overtime hours not worked is unacceptable, in direct conflict with Lincoln's Code of Conduct and demonstrates a lack of integrity. Your actions, as outlined above demonstrates falsification of records and is grounds for immediate termination." (*Id.*)

Stunzenas also raises concerns about the reliability of the Verint data surrounding his inactive and idle time. He maintains that "the Verint Policy in effect . . . specifically cautioned Lincoln that there was not yet enough known about collecting and applying Verint data to accurately rely on it." (ECF No. 28 at 24.) In particular, Stunzenas highlights one instance in which Verint data computed his idle/inactive time as 62 minutes for an hour-long period.

10

(ECF Nos. 28 at 23; 30-15 at 5.)  In response, Defendants maintain that "the Verint data unequivocally shows Stunzenas claimed overtime worked was impossible."  (ECF No. 31 at 5.)  Defendants highlight Verint data for three particular days, all falling on the weekend, which show discrepancies in the amount of overtime logged versus how much time Stunzenas actually worked.  (Id.)  For example, on Saturday, June 22, 2019, Stunzenas logged into work at 8:56AM, and signed off at 4:41PM, making for a possible 7.75 total hours of work.  (ECF No. 25-26 at 2.)  Verint registered his idle/inactive hours as 4.3 hours that day, which would leave the maximum amount of "active" hours worked at 3.45 hours.  (Id.)  Stunzenas claimed 7 hours of overtime on this day.  (Id.)  Similar discrepancies occurred on June 29, June 30, July 1, and August 12.  (ECF Nos. 31 at 5–6; 25-26 at 2–7.)

Stunzenas does not provide any evidence seriously contesting these discrepancies.  Accepting that Stunzenas' work as an auditor also involves researching "audit procedures" on paper—which could contribute to the idle/inactive computer time recorded by Verint—does nothing to undermine Lincoln's concerns about Stunzenas' recorded overtime.  According to Stunzenas, the time he spent researching these procedures varied depending on the type of audit and its complexity, but it "sometimes" took anywhere from five to fifteen minutes, sometimes longer.  (Stunzenas dep. at 45:1-7, 46:10-14.)  However, Stunzenas testimony suggests that the process of researching procedures did not mean that his computer activity was abandoned altogether.  (Id. at 46:23–47:5.)  As Stunzenas put it, "you look in the procedures and type exactly what they say on the procedures."  (Id. at 47:1-2.)  Stunzenas' brief in opposition to Defendants' motion also provides an estimate that "coding audits, may take 15 minutes to complete with 3-4 minutes used to research procedures," while another type of audit may take "about 22 minutes with about 6 minutes of researching procedures."  (ECF

11

No. 28 at 2.) Viewing this evidence in the light most favorable to Stunzenas, the Court finds that no reasonable jury could find that the referencing of audit procedures adequately explains the extent of Stunzenas' recorded idle/inactive time.

Finally, Stunzenas argues that he was treated less favorably than his comparators, which "is useful to the determination of whether an employer's explanation is pretextual." (ECF No 28 at 24.) Stunzenas contends that multiple other auditors on his team had lesser *productivity* scores than him but were not terminated. (*Id.*) Lincoln counters that it did in fact terminate four other individuals in the same department as Stunzenas (although not auditors) for misrepresenting the time they worked. (ECF No. 31 at 10–12.)

Stunzenas inaptly bases his argument on his colleagues' Verint *productivity* scores. As mentioned above, the Court does not find any genuine issue as to the ultimate reason for Stunzenas' termination: concerns over his *overtime* misrepresentations. The other auditors' productivity data that Stunzenas presents has no bearing on the ultimate reason for his termination. Further, Lincoln's evidence shows that the four other auditors on Stunzenas' team had *combined* logged essentially the same amount of overtime as Stunzenas had logged individually—85.75 and 82 hours, respectively. (ECF Nos. 31-2 at 2–6; 31 at 11.) This metric, along with Lincoln's evidence showing that it terminated four individuals in the same department as Stunzenas for misrepresenting overtime, seriously undermines Stunzenas' comparator argument.

Accordingly, the Court finds there is no genuine issue of material fact as to the reason for Stunzenas' termination. Based on the evidence presented by both sides, the Court finds that no reasonable jury could find that Lincoln's stated reason for Stunzenas' termination was

pretext and that the true reason was discriminatory. Defendants are thus entitled to judgment as a matter of law on Stunzenas' FMLA retaliation claim.

### B.    FMLA Interference

For similar reasons, Defendants are also entitled to judgment as a matter of law on Stunzenas' FMLA interference claim.

To make a facial claim of interference, the plaintiff must show "(1) he is entitled to an FMLA benefit; (2) his employer interfered with the provision of that benefit; and (3) that interference caused harm." *Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 427 (4th Cir. 2015). Here, Defendants concede the first element of the claim—that Stunzenas was entitled to an FMLA benefit. At issue is whether Defendants interfered with the provision of that benefit and whether that interference caused harm to Stunzenas.

Notably, the FMLA itself does not directly define interference. 29 U.S.C. § 2615(a)(1); *see also Antekeier v. Lab'y Corp. of Am.*, 295 F. Supp. 3d 679, 684 (E.D. Va. 2018). However, the Department of Labor regulation in 29 C.F.R. § 825.220(b) provides that "[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." Additionally, it would include the "manipulation by a covered employer to avoid responsibilities under FMLA," such as:

(1) Transferring employees from one worksite to another for the purpose of reducing worksites, or to keep worksites, below the 50–employee threshold for employee eligibility under the Act;

(2) Changing the essential functions of the job in order to preclude the taking of leave;

(3) Reducing hours available to work in order to avoid employee eligibility.

29 C.F.R. § 825.220(b).

13

Stunzenas argues that Defendants interfered with Stunzenas' benefit when "Ferebee both refused to authorize FMLA leave and discouraged Stunzenas from using leave." (ECF No. 28 at 17.) Stunzenas further argues that "Ferebee effectively denied Stunzenas the right to take FMLA Leave in the same manner as other Lincoln employees" when he "den[ied] Stunzenas' PTO request to be used in conjunction with FMLA Leave." (*Id.*)

The Court first notes a key fact to its inquiry: Stunzenas' request for FMLA leave was, in fact, approved. Stunzenas made his formal request for FMLA leave the week of August 12, 2019, and it was approved just a few days later, on August 16, 2019. (ECF No. 25-30 at 2.) His request for PTO to coincide with the requested period of FMLA leave was also approved. (ECF No. 25-5 at 2; Ferebee depo. at 235:5-7; Stunzenas depo. at 117:2–118:4; ECF No. 25-34 at 2.) The Court cannot find that this amounts to interference under the FMLA.

The Court likewise cannot accept Stunzenas' argument that he was either entitled to FMLA protection in February 2019 or that his original FMLA request was made in February 2019. (ECF No. 28 at 17.) Viewing the evidence in the light most favorable to Stunzenas, it is clear that he made no request for FMLA leave for the period of September 16 through October 4, 2019, until August 2019. Stunzenas' own testimony confirms this fact. (Stunzenas depo. at 73:2-7, 95:9-13.) For example, Stunzenas made clear that his February 14, 2019, PTO request was a request for PTO and not a request for FMLA and that he had no intent to request FMLA at that time. In response to a question about whether he had made a FMLA request, Stunzenas replied, "Not at this time, I have not. No. Because I -- I thought why I need FMLA if I -- I have enough PTO hours to -- get my time off what I needed for my daughters." (*Id.* at 73:2-7.)

Nor is Stunzenas' reliance on *Dotson v. Pfizer*, 558 F.3d 284 (4th Cir. 2009) persuasive. In *Dotson*, the Fourth Circuit ruled that employers must inquire about FMLA leave when an employee discusses leave for an expected birth or adoption. 558 F.3d at 295. Here, Stunzenas had already received parental leave for the birth of his children in January 2019. (Stunzenas dep. at 56:17–57:6.) Unlike Stunzenas' PTO request on February 14 to "spend time with his kids," the employee in *Dotson* "gave clear and advance notice that he was pursuing adoption, an FMLA-qualifying event." *Dotson*, 558 F.3d at 295.

Additionally, like an FMLA retaliation claim, the Fourth Circuit has found that termination for a legitimate, nondiscriminatory reason while an individual is on FMLA leave does not constitute FMLA interference. *See Yashenko*, 446 F.3d at 549–50 (finding defendant entitled to summary judgment on plaintiff's FMLA interference claim after plaintiff was terminated during his FMLA leave due to a legitimate restructuring of the defendant business); *Anderson v. Discovery Commc'ns, LLC*, 517 F. App'x 190, 198 (4th Cir. 2013) (finding defendant entitled to summary judgment on plaintiff's FMLA interference claim where her "termination of employment was a separate and unrelated event").

Here, the Court has already established that there is no genuine issue of fact as to the reason for Stunzenas' termination: the misrepresentation of overtime hours worked. Thus, Stunzenas' termination on September 5, 2019, for misrepresentation of overtime hours worked—eleven days before his FMLA leave was scheduled to begin—cannot constitute interference under the FMLA. Accordingly, the Court finds Defendants entitled to judgment as a matter of law on Stunzenas' FMLA interference claim.

The Court notes that its analysis of Stunzenas' interference and retaliation claims against the Lincoln Defendants is equally applicable to the same claims that Stunzenas raises

15

against Ferebee individually. Similarly, there is no genuine factual dispute as to Ferebee's lack of direct control over the approval of FMLA leave. (Stunzenas dep. at 114:7-19; Ferebee dep. at 204:11-14.) "[A] supervisor must have 'sufficient responsibility or stature within the [defendant employer] to warrant the imposition of personal liability under the FMLA.' . . . The relevant inquiry is to what extent the supervisor exerted control over the plaintiff's FMLA rights." *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 598 (D. Md. 2013) (quoting *Benton v. Belk, Inc.*, No 12–766, 2012 WL 5381209, at *2 (D.S.C. Sept. 20, 2012)).

Here, Ferebee's lack of control over FMLA approval is insufficient to impose any individual liability under FMLA. Stunzenas does not contest the fact that Ferebee has no power to approve or deny FMLA leave requests and that such decisions are left to Lincoln's "group protection" department. (ECF No. 28 at 26; Stunzenas dep. at 58:9–59:22, 114:7-19 ("[Ferebee]·cannot deny [FMLA] because it's another department [that] approves my FMLA."); Ferebee dep. at 204:11-14; Konnick dep. at 7:15-16.) Instead, Stunzenas emphasizes Ferebee's ability to approve or deny Stunzenas' PTO requests. (ECF No. 28 at 26.) That fact alone does not change that Ferebee could not himself approve Stunzenas' FMLA requests and thus did not "exert[] control over the plaintiff's FMLA rights." *Caire*, 982 F. Supp. 2d at 598.

C.      **Title VII, ADEA, and NCEEPA Claims**

While Defendants move for summary judgment on all six of Plaintiff's claims, Plaintiff's brief in opposition only addresses two of those claims: FMLA retaliation and interference. (ECF No. 28.) Plaintiff does not offer any response, nor contest in any way, Defendants' arguments on the claims of wrongful discharge because of race and national origin in violation of NCEEPA; wrongful discharge because of age in violation of NCEEPA;

16

discrimination and wrongful termination because of race and national origin in violation of Title VII; and age discrimination in violation of the ADEA. (*Id.*)

Local Rule 7.3(k) of this Court states that "[t]he failure to file a brief or response within the time specified in this rule shall constitute a waiver of the right thereafter to file such brief or response, except upon a showing of excusable neglect." Local Rule 7.2(a) requires that response briefs shall contain an "argument, which shall refer to all statutes, rules and authorities relied upon." Courts in this district have construed these rules to also cover unresponded-to arguments. *See, e.g.*, *Hadley v. City of Mebane*, No. 18-CV-366, 2020 WL 1539724, at *6 (M.D.N.C. Mar. 31, 2020); *Brand v. N.C. Dep't of Crime Control & Pub. Safety*, 352 F. Supp. 2d 606, 618 (M.D.N.C. 2004); *Kinetic Concepts, Inc. v. ConvaTec Inc.*, No. 08-CV-00918, 2010 WL 1667285, at *7–8 (M.D.N.C. Apr. 23, 2010). Thus, "[w]hen a party fails to respond to a summary judgment motion regarding a claim, the party essentially concedes that summary judgment in favor of the moving party is appropriate." *Harris v. hhgregg, Inc.*, No. 11-CV-813, 2013 WL 1331166, at *4 (M.D.N.C. Mar. 29, 2013) (citing *Brand*, 352 F.Supp.2d at 618).

Here, Stunzenas has failed to respond to the rest of Defendants' arguments beyond each FMLA claim. Stunzenas has failed to include an "argument" per Local Rule 7.2(a), and therefore failed to properly file a "brief" in accordance with Local Rule 7.3(k). Due to these failures, the Court will deem Stunzenas' arguments on these claims conceded. Moreover, the Court has reviewed Defendants' motion as to these remaining claims and concludes that summary judgment is appropriate for the remaining claims. *See Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403, 409 n.8 (4th Cir. 2010) ("[I]n considering a motion for summary judgment, the district court 'must review the motion, even if unopposed, and determine from what it has

before it whether the moving party is entitled to summary judgment as a matter of law.'" (quoting *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993))).

The Court will address each remaining claim in turn, beginning with Plaintiff's claims arising under federal law.

        1.   <u>Title VII</u>

To establish a prima facie case of discrimination under Title VII, a plaintiff must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). If a plaintiff establishes a prima facie case of discrimination, then under the *McDonnell Douglas* framework the burden shifts to the defendant to articulate a non-discriminatory reason for an adverse action. *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 216 (4th Cir. 2016). If the defendant articulates such a reason, "the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory." *Id.*

Defendants contend that Stunzenas cannot make out a prima facie case of discrimination on the basis of Plaintiff's Lithuanian national origin.[1] Specifically, Defendants maintain that Stunzenas cannot show that he was treated differently than his American-born peers. (ECF No. 25 at 18.) The Court agrees. Again, Stunzenas presents no evidence of differential treatment. Lincoln similarly terminated four of Stunzenas' American-born peers

---

[1] Stunzenas also raises a race discrimination claim. However, Stunzenas himself admitted that "[his] race is white." (Stunzenas dep. at 188:11.) Stunzenas also responded to the question "do believe you were treated any differently because of your race?" with a clear "no." (*Id.* at 188:12-16.) Accordingly, the Court agrees with Defendants that this claim must fail.

18

for misrepresentation of overtime hours worked, (ECF No. 25-36 at 12–13), which Stunzenas does not contest.

Nor do the few instances of Lincoln employees commenting on Stunzenas' Lithuanian heritage come anywhere close to the "steep requirements of a hostile work environment claim." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019). The Supreme Court has made clear that "simple teasing," "offhand comments," and "isolated incidents (unless extremely serious)" are insufficient to afford relief under Title VII. *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Here, the extent of Stunzenas evidence is testimony that he felt "excluded" by coworkers and that coworkers would sometimes laugh or correct him when he said something incorrectly due to his accent. (Stunzenas dep. at 168:8-14.) Stunzenas was also once asked questions about whether people in Lithuania had television or cars. (*Id.* at 172:9-17.) Notably, Stunzenas testified that he could not remember the last time this happened or who had made a comment, (*id.* at 179:23–180:1), and that any teasing would have been *before* the birth of his daughters in January 2019, (*id.* at 180:2-24).

Considering this evidence in the light most favorable to Stunzenas, the Court finds Defendants entitled to judgment as a matter of law on Stunzenas' Title VII claims.

2. ADEA

Stunzenas' age discrimination claim similarly fails. "The 'elements of a[n] [ADEA] cause of action,' . . . are the following: the plaintiff is (1) over the age of 40, and (2) experienced discrimination by an employer (3) because of his age." *Tickles v. Johnson*, 805 F. App'x 204, 207 (4th Cir. 2020) (quoting *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 585 (4th Cir. 2015) and citing *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006)).

19

Here, there is no evidence—outside of Stunzenas' own subjective belief—that he ever experienced discrimination because of his age. It is well-established that "generalized testimony by an employee regarding his subjective belief that his discharge was the result of age discrimination is insufficient to make an issue for the jury in the face of proof showing an adequate, nondiscriminatory reason for his discharge." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 459 (4th Cir. 1989) (quoting *Elliott v. Grp. Med. & Surgical Serv.*, 714 F.2d 556, 564 (5th Cir. 1983)). The only evidence offered by Stunzenas relevant to this claim is his opinion that "[Ferebee] wanted to replace [him] with younger" employees and that Ferebee socialized with "young people, but not with [him]" because of his age. (Stunzenas dep. at 185:10-20.) Defendants also provide evidence that three of the four other employees that were terminated for the same reason as Stunzenas were under forty.[2] (ECF No. 25-36 at 12–13.) Thus, there is no genuine issue of material fact that Stunzenas was discriminated against because of his age. Accordingly, the Court finds Defendants entitled to judgment as a matter of law on Stunzenas' ADEA claim.

3. NCEEPA

Stunzenas' wrongful discharge claims on the basis of national origin, race, and age under North Carolina law also fail. "Wrongful discharge claims asserted under the [NCEEPA] are analyzed under the same burden-shifting scheme as federal discrimination statutes." *Hardin v. Belmont Textile Mach. Co.*, 355 F. App'x 717, 721 (4th Cir. 2009) (citing *N.C. Dep't of Corr. v. Gibson*, 301 S.E.2d 78, 82–84 (N.C. 1983)); *see also Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir. 1995) ("Given the similar language and underlying policy of § 143-422.2 and Title VII, 42 U.S.C. § 2000e *et seq.*, the North Carolina Supreme Court explicitly has adopted the

---

[2] At the time of his termination, Stunzenas was around fifty-five. (Stunzenas dep. at 8:24-25.)

Title VII evidentiary standards in evaluating a state claim under § 143-422.2.").  "Thus, a claim for wrongful discharge in violation of the public policy set forth in the NCEEPA rises and falls with its counterpart under Title VII."  *Tran v. Novo Nordisk Pharm. Indus., Inc.*, No. 14-CV-254, 2016 WL 1559137, at *11 (E.D.N.C. Apr. 18, 2016).  The Court's previous analysis on Stunzenas' federal claims for national origin, race, and age discrimination are therefore dispositive here.  Defendants are thus entitled to judgment as a matter of law on Stunzenas' NCEEPA claims as well.

For the reasons stated herein, the Court enters the following:

## ORDER

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment, (ECF No. 24), is **GRANTED**, and this action is **DISMISSED**.

This, the 5th day of December 2022.

/s/ Loretta C. Biggs
United States District Judge